**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**HARRY BOSWELL, JR.,**

      **Plaintiff,**

**v.**                                **Case No.: 1:17-cv-03411**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's motion and brief, requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 12, 13, 16).

The undersigned has fully considered the evidence and the arguments of

counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On April 1, 2014, and April 14, 2014, respectively, Plaintiff Harry Boswell, Jr., ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of April 1, 2013, (Tr. at 209, 211), due to "Anxiety, Depression, Back problems, Kidney stones, Migraines, Vertigo, [and] Foot problem." (Tr. at 252). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 123-125, 131-136). Claimant then filed a request for an administrative hearing, (Tr. at 137), which was held on May 11, 2016, before the Honorable Michael D. Mance, Administrative Law Judge ("ALJ"). (Tr. at 40-70). By written decision dated August 3, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on June 9, 2017, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8,   9). Claimant filed a Motion and Brief in Support of Judgment on the Pleadings, (ECF Nos. 12, 13), and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 16). Consequently, the matter is fully briefed and ready

for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 44 years old at the time that he filed the instant applications for benefits, and 47 years old on the date of the ALJ's decision. (Tr. at 11, 45, 209, 211). He has a seventh grade education and communicates in English. (Tr. at 45, 251, 253). Claimant has prior work experience as a self-employed laborer pressure-washing houses and sealing driveways. (Tr. at 46, 253).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals

3

any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 1, 2013, the alleged

4

disability onset date. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "recurrent kidney stones, migraines, Meniere's disease, anxiety, depression, and degenerative disc disease, degenerative joint disease, and spondylosis of the lumbar spine." (Tr. at 13, Finding No. 3). The ALJ considered Claimant's other alleged impairments of right knee problems, left foot problems, and gastrointestinal reflux disease ("GERD") and found them to be either non-severe or not medically determinable. (Tr. at 13-14, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours out of an 8-hour workday, and stand and walk for 6 hours out of an 8-hour workday. He can never climb stairs, ramps, ropes, ladders or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He should work in a temperature controlled environment. He should avoid concentrated exposure to pulmonary irritants, unprotected heights, excessive vibrations, and hazardous machinery. He can perform unskilled work only.

(Tr. at 15-21, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1969, and was defined as a younger individual age 18-49; (2) he had at

least a limited education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 21, Finding Nos. 7-9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 21-22, Finding No. 10), including work as a sales attendant, marker, or counter attendant at the unskilled, light exertional level.  Consequently, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 22-23, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises three challenges to the Commissioner's decision. The first two challenges arise from the ALJ's assessment of Claimant's vertigo and its impact on Claimant's functional abilities. In particular, Claimant contends that the ALJ underestimated the severity and functional consequences of Claimant's vertigo. (ECF No. 13 at 10-12). In the third challenge, Claimant maintains that the ALJ made an RFC finding prior to assessing Claimant's credibility, which is prejudicial error requiring remand under *Mascio v. Colvin,* 780 F.3d 632, 639-40 (4th Cir. 2015). (*Id.* at 12).

In response, the Commissioner argues that the ALJ fully considered and assessed Claimant's vertigo and explained why the vertigo did not substantially limit Claimant's RFC. (ECF No. 16 at 7-8). The Commissioner emphasizes that Claimant received only sporadic treatment for vertigo and suffered from that condition for decades, while still being able to work. With respect to the credibility analysis, the Commissioner indicates that even if the ALJ should have discussed the credibility

analysis before stating the RFC finding, such error was harmless. According to the Commissioner, Claimant has the burden of demonstrating prejudice from an alleged error, and if he fails to do so, the case should not be remanded. The Commissioner contends that the ALJ provided a reasonable explanation for his credibility assessment, and Claimant has not identified any prejudice arising from the order in which the ALJ provided his rationale for the RFC finding. Consequently, there is no basis for remand.

## V.     Relevant Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The information most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

On May 13, 2011, Claimant was examined by Tahir I. Rana, M.D., a neurologist, at the request of Claimant's treating physician, Dr. Crews. (Tr. at 383-85). Claimant complained of having headaches since childhood, which started as a heaviness in his eyes, followed by black spots in his eyes. He then experienced pain in the left side of his head, which gradually progressed to a ten on a ten-point pain scale and was accompanied by photosensitivity, phonosensitivity, and nausea. Claimant took Naprosyn to treat the pain and Imitrex if the symptoms were "full blown." Claimant denied having double vision, but reported having dizziness. He stated that he had dizziness without headaches as well and had felt dizzy all of the time for the past several years. Claimant also had a spinning sensation at times, which occurred with bright lights and spinning objects. Claimant indicated that he was employed at the time.

On examination, Claimant appeared alert, oriented, and awake. His concentration, short-term memory, and long-term memory were good, and his

7

cognitive function and comprehension were intact. Claimant's eyes were normal; his visual acuity was 20/30 bilaterally without glasses. His hearing was intact, and he had no neurological abnormalities. An MRI of the head was taken and was interpreted as unremarkable. Dr. Rana diagnosed Claimant with classical migraine headaches; chronic dizziness and intermittent vertigo of unclear etiology, but could be related to anxiety, migraine, carotid disease, or more unlikely, seizures; daytime sleepiness and fatigue with possible sleep apnea that could also be a cause of Claimant's dizziness; and chronic back and left lumbar radicular pain. Dr. Rana ordered an MRA of the head, a carotid Doppler, an EEG, an EMG, and a sleep study. He prescribed Topamax for treatment of migraine headaches.

On January 6, 2013, Claimant was examined by Patricia Clark, D.O., at Med Express, for complaints of vomiting and sinus issues. (Tr. at 501-03). A review of systems was negative for headaches. Claimant's physical examination was negative other than for symptoms consistent with the diagnosis of sinusitis.

On June 28, 2013, Claimant presented to Stephen J. Wetmore, M.D., at WVU Healthcare, for an evaluation of dizziness. (Tr. at 330-32). Claimant reported that he had experienced episodes of dizziness since his early twenties. The dizziness began as a spinning sensation, but that feeling had subsided approximately two decades earlier. He described his current baseline dizziness as a feeling of being "off balance" and "not focused right." Claimant further experienced motion sensitivity, especially when seeing carnival rides, lights, or home videos. The episodes of dizziness made him nauseous and often led to a headache; they occurred at least once per month and could last for days. During the episodes, Claimant would feel heaviness or fullness in his left ear. He described the headaches as frontal parietal pain accompanied with phonophobia and

8

photophobia, sometimes preceded by swirls or other visual manifestations. Claimant reported having previously been examined by Dr. Rana in Princeton, West Virginia, who diagnosed Claimant with migraine headaches. Claimant received Topomax and Imitrex, but he did not tolerate the medications well. Claimant underwent a videonystagmography several years earlier, which led to a recommendation that Claimant undergo vestibular rehabilitation; however, he did not follow-up with that treatment recommendation.

Dr. Wetmore examined Claimant, noting him to be pleasant, cooperative, healthy in appearance, and in no acute distress. His examination was unremarkable except for an ancillary finding that Claimant's left leg was slightly shorter than the right, leading to some gait instability. Dr. Wetmore reviewed a prior MRA taken at Community Radiology in Bluefield and saw no acute stenotic or aneurysmal lesions. He also reviewed magnetic resonance venography ("MRV") results, documenting that they were normal. An audiogram performed earlier in the day by Dr. Mary E. Koike, (Tr. at 333-35), showed speech reception thresholds of five decibels in the right ear and fifteen decibels in the left ear, with slight to mild sensoneural notches on the right. Claimant had slight low frequency sensoneural hearing loss in the left ear and Type A tympanograms[1] bilaterally. Dr. Wetmore reviewed the records prepared by Dr. Rana and agreed with his diagnosis of dizziness, most likely caused by migraines. Given Claimant's prior experience with Topamax and Imitrex, Dr. Wetmore prescribed a low-dose tricyclic antidepressant with a gradual increase in dosage as tolerated. Dr.

---

[1] Tympanography is testing used to detect problems in the middle ear. *See Health Information,* U.S. National Library of Medicine, U.S. Department of Health and Human Services, National Institutes of Health, Rockville, MD. A Type A tympanogram is considered normal. *See Continuing Education: Tympanometry,* The Health Professional, International Hearing Society, Livonia, MI.

Wetmore suggested that Claimant follow-up with Dr. Rana for the sake of convenience and return to WVU as needed.

On October 16, 2013, Claimant was examined by Dr. Holbrook at Med Express. Claimant was in no acute distress. A review of systems was negative for headaches and Claimant's examination was unremarkable. (Tr. at 509-10).

Claimant returned to Dr. Rana on March 21, 2014. (Tr. at 391-93). Claimant reported that he "was doing the same," still getting headaches at least twice a month with occasional dizziness. Claimant also complained of occasional "noise" in his ears. A physical examination was unremarkable. Dr. Rana diagnosed Claimant with classical or vestibular migraines, which were stable; motion induced disequilibrium that was chronic and of unclear etiology; and anxiety disorder. Dr. Rana noted that all preventative medications for migraines had been tried, but Claimant either could not tolerate them or they did not help. With respect to Claimant's disequilibrium and tinnitus, Dr. Rana suggested a video EEG, but Claimant refused, saying he could live without it. Dr. Rana recommended that Claimant continue taking his medications.

On April 29, 2014, Claimant was examined by family nurse practitioner, Carolyn L. King, complaining of dizziness that was constant and worsening. (Tr. at 408-10). Claimant told Nurse King that due to dizziness, he felt like he wanted to sleep all of the time. He also complained of tinnitus and headaches. A physical examination was unremarkable. Claimant was assessed, in relevant part, with hyperlipidemia and vertigo. For treatment of vertigo, Claimant was prescribed Antivert, provided counseling on diet and exercise, and advised to return in six months.

One day later, on April 30, 2014, Claimant saw Dr. Rana, who documented that Claimant continued to have "motion induced dizziness." (Tr. at 387-91). Claimant

could not look at moving water, flashing lights, or curvy roads while in the car, or go to amusement parks, as they made him dizzy. Claimant tried taking Dramamine for nausea but that did not offer him any relief. Claimant also complained of headaches and occasional ear pain. He stated that Antivert and Klonopin made him sleepy, so he could not take them during the day. Claimant's physical examination was unremarkable. Dr. Rana diagnosed Claimant with possible classical vestibular migraines; motion induced disequilibrium, nausea, and vertigo of unknown etiology; anxiety disorder; depression without suicidal thoughts; fatigue and decreased energy of unknown etiology, although possibly associated with depression and anxiety. Dr. Rana advised Claimant to continue taking Klonopin and Antivert. Dr. Rana documented that he had a long discussion with Claimant and his wife about his unexplained disequilibrium, motion sickness, and inability to tolerate the medications prescribed. Dr. Rana suggested referring Claimant to WVU for further testing and a second opinion, but Claimant refused. He did agree to see a psychiatrist for his depression and anxiety, however.

On July 11, 2014, Claimant presented to Dr. Alessandro Ambroz at Med Express with complaints of left ear pain, nausea, and dizziness. (Tr. at 513-14). A physical examination revealed erythema of the left ear tympanic membrane, but was otherwise normal, including normal strength, motor skills, sensory response, coordination and balance. Claimant was diagnosed with otitis media and prescribed Amoxicillin and Zofran.

Claimant was examined on July 25, 2014, by Kamalesh Patel, M.D., at Bluefield Gastroenterology for complaints of abdominal pain along with occasional vomiting. (Tr. at 557-60). Dr. Patel recorded that Claimant was cooperative and did not "appear

11

acutely ill." A review of systems was negative for headaches, musculoskeletal symptoms, and neurological abnormalities. Claimant demonstrated a normal gait and normal physical findings. Claimant was diagnosed with heartburn and nausea with vomiting.

On August 22, 2014, Claimant was examined by nurse Carolyn King, for a primary complaint of back pain, although a review of systems was also positive for headaches and sleep issues. A neurological examination showed Claimant to be alert and oriented with cranial nerves grossly intact. (Tr. at 411-13). Soon thereafter, on August 31, 2014, Claimant was seen at Princeton Community Hospital for nausea and vomiting with complaints of a kidney stone that had not yet passed. (Tr. at 431-33). On examination, Claimant appeared alert, well and in no apparent distress. Other than nausea and flank pain, a review of systems was negative. Claimant had no motor or sensory deficits.

Two weeks later, on September 14, 2014, Claimant returned to Princeton Community Hospital for complaints of abdominal pain, dizziness, and nausea. Claimant believed the prescribed Percocet was causing his nausea. He also reported a history of vertigo and dizziness. (Tr. at 425-30). His physical examination was unremarkable. Claimant was diagnosed with abdominal pain and nausea. Dr. James Morgan prescribed Hydrocodone for pain as needed.

On February 27, 2015, Claimant presented to Michael Crews, D.O. (Tr. at 485). Dr. Crews recorded that Claimant usually treated with nurse Carolyn King for mood issues, but was unable to obtain an appointment with her on this date. Claimant requested medication refills. His current illnesses included daily headaches, some of which began with visual disturbances followed by nausea. His medications were

Tylenol, Klonopin, Antivert, Prevastatin, Norco, Cymbalta, Zofran, Flomax, Cyclobenzaprine, Neurontin, Nasonex, Singulair, and Prilosec. Claimant had an unremarkable physical examination.

One month later, on March 13, 2015, Claimant returned to Princeton Community Hospital for complaints of flank pain; however, he had no complaints of nausea or vomiting. (Tr. at 481-84). A review of systems was negative other than his primary complaint. On examination, Claimant was alert and oriented, demonstrating a normal gait, with no motor or sensory deficits. Claimant was diagnosed with flank pain.

On April 9, 2015, Claimant was examined by Macy Samo, M.D., for complaints of right ear pain and dizziness for the past two days. (Tr. at 516-17). Claimant described a feeling of fullness that accompanied the pain in his ear and mild lightheadedness; however, he denied vertigo. A review of systems was positive for otalgia and headache. Claimant was diagnosed with acute right otitis media for which he was prescribed Amoxicilin and Loratadine.

Claimant returned to nurse Carolyn King on June 26 and December 23, 2015 in follow-up of his various medical issues. (Tr. at 486-87, 569-74). In June, Claimant reported having dizziness and headache on the left side of his head into the back of his neck. His physical examination was essentially normal, except for weakness of his left foot. He was given Antivert for dizziness. In December, Claimant told Nurse King that he was having sinus drainage that caused him to cough and "bothered" his ears, "different from [his] dizziness." He also reported monthly migraine headaches and constant dizziness. Claimant indicated that the headaches were associated with pain concentrated on the left side of his head, and they had been "bad the entire month of

13

December." His physical examination was unremarkable. Claimant's assessment at this visit included dizziness, giddiness, and fatigue.

On January 21, 2016, Claimant was examined by family nurse practitioner, Leslie Farr, at Mountain State ENT. (Tr. at 521-24). Claimant complained of headaches, vertigo, and left ear pain. Claimant indicated that his left ear felt like it was full of air and water, a sensation which he said had been present since his early 20's. Claimant told Nurse Farr that he had constant migraine headaches, ringing in his left ear and episodes of dizziness, that, when present, severely impaired his ability to function in most of his daily activities. The dizziness was recurrent and chronic, beginning when Claimant was 19 or 20 years old and had not changed in overall severity. On examination, Claimant was well developed and well nourished, in no acute or chronic distress, and could communicate in a normal fashion. Claimant underwent tympanometry testing, which showed bilateral type A tympanograms. Claimant was assessed with a deviated nasal septum, nasal congestion, vertigo not otherwise specified, headache, and tinnitus of the left ear. All of these conditions were considered to be stable and controlled. As Claimant complained of left side hearing loss, Nurse Farr ordered an audiogram with vestibular testing, as well as a referral to a neurologist.

On February 5, 2016, Claimant presented to Blue Ridge Hearing and Balancing Clinic for an audiogram and vestibular evaluation as performed by Tara Minnix-Harmon, Au.D. (Tr. at 536, 538, 540). Claimant provided a longstanding history of constant imbalance or unsteadiness, describing that any type of visual stimulation caused him disequilibrium, with numerous "spinning" episodes, and a feeling of fullness in the left ear. An examination revealed clear ear canals. Tympanometry showed normal bilateral mobile tympanic membranes. An audiometric evaluation

revealed mild sensorineural hearing loss in both ears. Compared to a 2011 hearing evaluation, Claimant had a decrease in low frequencies in his left ear. A VNG evaluation demonstrated normal ocular motor abilities. No gaze or spontaneous nystagmus was noted. Dynamic positioning tests revealed no positional nystagmus. Rotational chair tests of low frequency vestibular ocular reflex were found to be within normal limits. Monothermal warm air caloric irrigation revealed normal and equal bilateral response. However, computerized dynamic posturography was abnormal, reflecting that Claimant could not maintain postural control when both visual and propriocentive cues were removed. Claimant was assessed with abnormal platform testing and referred back to Nurse Farr for symptom management.

Claimant returned to Nurse Farr on February 15, 2016 to follow-up on his recent audio tests. (Tr. at 525-28). Claimant did not voice any new complaints. A review of systems was negative for dizziness, hearing loss, or tinnitus. Claimant's physical examination was found within normal limits. He did not appear in any acute or chronic distress and demonstrated a normal ability to communicate. Claimant reported that he was recently examined by Dr. Rana and that he "checked out alright." Claimant was assessed with deviated nasal septum, nasal congestion, vertigo not otherwise specified, headache, left ear tinnitus, and bilateral Meniere's disease,[2] all of which were found to be controlled and in stable condition. Claimant was provided a prescription for Maxzide and advised to stick to a low sodium diet. Two days later, on February 17, Claimant returned for laboratory tests and monitoring following administration of Maxzide. (Tr. at 533-35). A review of systems was negative for migraine headache.

---

[2] Meniere's disease is a fairly common inner ear disorder that affects balance and hearing. *See Health Information*, U.S. National Library of Medicine, U.S. Department of Health and Human Services, National Institutes of Health, Rockville, MD.

Claimant's medication regimen included Clonazepam, Colestipol, Duloxetine, Gabapentin, Maxzide, Omeprazole, Ranitidine, and Tramadol.

On March 10, 2016, Claimant returned to Nurse Farr for follow-up of his diagnosis of Meniere's disease and his complaints of "dizzy spells" that involved nausea and vomiting despite taking Maxzide. (Tr. at 529-32). Nurse Farr noted that since Claimant's onset of dizziness, the overall severity had slightly decreased. Claimant had no new complaints. He was assessed with deviated nasal septum, controlled and stable; nasal congestion, controlled and stable; however, his remaining assessments of vertigo not otherwise specified, headache, left ear tinnitus and bilateral Meniere's disease were found to be uncontrolled and unstable. Claimant was advised to continue taking his current medication regimen and return in one month. As Claimant reported gaining no relief from the current dose of Maxzide, another laboratory test was ordered and his dosage was increased.

That same day, Claimant was examined by Shannon Hilling at Bluefield Gastroenterology for follow-up to GERD. (Tr. at 552-56). Claimant complained of nausea and vomiting along with heartburn and indigestion. A review of systems was negative for fatigue and headaches. On examination, Claimant appeared stable and alert.

On March 11, 2016, Claimant was examined by nurse Carolyn King, for follow-up to a recent emergency room visit due to chest pain. (Tr. at 566-68). A review of systems was positive for headache and tinnitus; however, it was negative for visual disturbances, and no mention was made of problems with dizziness or vertigo.

On April 17, 2016, Claimant went to Princeton Community Hospital for possible kidney stones complaining of flank pain along with lightheadedness, nausea, and

vomiting. (Tr. at 589-98). Claimant appeared alert and in no apparent distress, demonstrating normal mood and affect. There were no motor or sensory deficits noted. Claimant was discharged in stable condition.

### B. Evaluations and Opinions

On June 20, 2014, Brad Henry, M.D., performed a disability determination examination at the request of the SSA. (Tr. at 395-400). Claimant reported that he last worked in 2013, but quit due to health issues including kidney stones and migraine headaches. He stated that he had headaches about twice a week, although not all were migraines. Sometimes, the headaches would last for days and would interfere with his concentration. Nonetheless, Claimant could care for his home, feed and dress himself, do yard work and light housework. On examination, Claimant appeared alert and oriented with no sensory or motor deficits. His cranial nerves were intact and his deep tendon reflexes were normal, although he had slightly decreased strength in his left foot.  Alternating motion, finger-to-nose and heel-to-shin, were found to be within normal limits. Dr. Henry diagnosed Claimant with migraine headaches, but noted that Claimant was not currently taking any medication for this condition. Dr. Henry also documented Claimant's history of vertigo, but added that no symptomatology was observed during the examination.

On June 27, 2014, Sunny S. Bell, M.A., performed a disability determination examination. (Tr. at 401-05). Claimant was driven to the examination by his wife and, although he was in possession of a driver's license, stated that he could not drive because he "get[s] lightheaded." Nevertheless, when describing his daily activities, Claimant reported that he does drive and that he "put[s] gas in the vehicle and runs errands."  Claimant indicated that he was applying for disability benefits; in part, due

to vertigo and migraine headaches, stating that these conditions prevented him from working. Claimant was self-employed for sixteen years as a laborer sealing driveways and operating a pressure washer. On mental status examination, Claimant demonstrated good posture and a steady gait. He did not appear to have any visual or hearing problems. Claimant's immediate memory was within normal limits; however, his recent memory was severely deficient and his remote memory was mildly deficient. Claimant's ability to concentrate and his persistence and pace were all within normal limits. Claimant's daily activities included taking care of his personal grooming, driving, taking short walks, and sitting outside.

On September 25, 2014, Subhash Gajendragadkar, M.D., completed a physical residual functional capacity assessment. ((Tr. at 102-104). Dr. Gajendragadkar found Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; and stand, walk or sit about six hours in an eight-hour workday. Claimant had unlimited ability to push and/or pull within the parameters of his lift and/or carry restrictions. Dr. Gajendragadkar supported these conclusions by taking note of, in part, Claimant's history of vertigo with no current symptoms. Claimant could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl but could never climb ladders, ropes or scaffolds. Claimant had no manipulative, visual, or communicative limitations. As for environmental limitations, Claimant could have unlimited exposure to noise, fumes, dusts, odors or poor ventilation; however, he needed to avoid exposure to extreme temperatures, humidity, vibration and hazards; such as, machinery or heights. These limitations were also supported, in part, by Claimant's history of vertigo. Dr. Gajendragadkar opined that Claimant retained the ability to perform light work with the listed postural and environmental limitations.

### C. Claimant's Statements

In an Adult Function Report prepared on April 24, 2014, (Tr. at 266-73), Claimant stated that kidney stones, migraine headaches, and anxiety interfered with his ability to work. (Tr. at 266).  When feeling up to it, Claimant spent the day watching television, talking with his family, taking naps, and eating. (Tr. at 267). He had no problem with personal care and could make light meals, such as sandwiches. (Tr. at 267-68). Claimant mowed the grass and took out the trash, but did no other household chores or yard work. He was able to drive and ventured outside two to three times per week. (Tr. at 269). Claimant attended church weekly and went to doctors' appointments. (Tr. at 270). He reported having trouble paying attention and following directions. (Tr. at 271).  Claimant did not use any assistive devices. He complained of having vertigo, and stated that he always experienced some level of dizziness. (Tr. at 273).

On September 5, 2014, Claimant updated the Adult Function Report. (Tr. at 289-98). He described having nausea and dizziness due to vertigo and migraine headaches that lasted days at a time. (Tr. at 289). As for his daily activities, Claimant stated that he arose between 5:00 a.m. and 6:00 a.m. and ate breakfast around 8:00 a.m. He watched television, slept, lounged around, and got up to eat and go to bed. (Tr. at 291). He was able to do his own personal care without difficulty. Claimant mowed the yard with a riding mower and went outside once or twice per week. (Tr. at 292-93). He also went bowling two or three times per month. (Tr. at 294). Claimant continued to attend church and physician appointments. He did not use any assistive devices. (Tr. at 297). He indicated that most of the medications he took had drowsiness as a side effect, and Klonopin and Flomax caused dizziness. (Tr. at 298).

At the administrative hearing on May 11, 2016, Claimant testified that vertigo prevented him from working. (Tr. at 46). He indicated that his vertigo was caused by Meniere's disease, and when he experienced an episode, it could last as long as two or three days. (*Id.*). While having an attack of vertigo, Claimant was unable to do anything other than lay and rest. Claimant admitted that he suffered from dizziness for a long time, but stated that the episodes had gotten more prolonged with time. (Tr. at 56). Claimant testified that he also suffered from migraine headaches, and he had migraines and vertigo approximately two times per week. (Tr. at 49).

When asked about his daily activities, Claimant stated that he slept when he had vertigo or a migraine. On days without those conditions, he could bathe and dress himself, feed himself, and watch television. Claimant indicated that he could drive short distances and occasionally went to church. (Tr. at 49-50, 60). He estimated that he could walk for 10 minutes on average before having to rest; could stand for thirty-five minutes before having to sit; could sit for thirty minutes before having to stand; and could lift about 15 to 20 pounds. (Tr. at 51-52).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    Discussion

### A. Claimant's Vertigo

Claimant's first two challenges involve the thoroughness and accuracy with which the ALJ assessed Claimant's vertigo and its functional consequences. Having reviewed the evidence and the written decision, the undersigned **FINDS** no error in the ALJ's assessment and articulated conclusion.

The ALJ initially reviewed Claimant's statements regarding the nature, intensity, frequency, persistence, and limiting effects of his vertigo, noting that Claimant alleged that this condition prevented him from working. (Tr. at 15). The ALJ next assessed the credibility of Claimant's statements by comparing them to the other

evidence of record. The ALJ examined all of the medical notations related to Claimant's dizziness and vertigo, highlighting a few of the entries that best documented the signs, symptoms, findings, and treatment associated with these conditions. (Tr. at 17). The ALJ indicated that Claimant was evaluated for dizziness in June 2013, which he described as a feeling of being off balance and unfocused. An MRA was normal, and an audiogram reflected mild hearing loss, with Claimant retaining 96%-100% speech discrimination in his ears. At that time, the evaluating physician opined that Claimant's dizziness was related to migraine headaches and prescribed a low dose tricyclic antidepressant. (*Id.*). Ten months later, in April 2014, Claimant's dizziness was diagnosed as vertigo, and he was given a prescription for Antivert. One year and nine months later, in January 2016, Claimant was diagnosed with Meniere's disease, but his vertigo and headaches were considered to be controlled and stable. Due to his diagnosis, however, Claimant was started on Maxzide.

The ALJ also reviewed the consultative examinations and opinions, noting that in July 2014, Claimant's examination by Dr. Henry was unremarkable with respect to dizziness and headaches. Indeed, at that time, Claimant was not taking any medication for migraine headaches. (Tr. at 18). Claimant underwent two psychological examinations, as well, which showed few abnormalities in mental functioning.

After considering the other evidence, the ALJ concluded that the record was not supportive of Claimant's allegations of disabling limitations. In regard to Claimant's vertigo, the ALJ explained that Claimant had a long history of vertigo; he sought only sporadic medical care for the condition; and when he adhered to the medication regimen recommended by his physicians, his vertigo stabilized and was controlled. (Tr. at 19). The ALJ acknowledged that Claimant had a spike of symptoms in March 2016;

22

however, his treating health care provider did not feel his medication was at a therapeutic level at that time and increased the dosage.

The ALJ further reviewed Claimant's daily activities. (Tr. at 20). He indicated that Claimant was able to mow the yard, prepare meals, take out trash, care for his personal grooming, drive, watch television, and regularly attend church. The ALJ felt that the range of Claimant's activities belied his allegations of disability. According to the ALJ, if Claimant's symptoms were truly as limiting as he claimed, he would not be able to perform the daily and weekly activities he described.

Finally, the ALJ explained that although he did not believe that Claimant's allegations were entirely credible, he believed that Claimant's impairments significantly affected his RFC, requiring a reduction to less than a full range of light level work. The ALJ found that Claimant could not climb stairs, ramps, ropes, or ladders and needed to completely avoid unprotected heights and hazardous machinery. (Tr. at 21). Obviously, these limitations were designed to address Claimant's vertigo and migraine-related dizziness.

Contrary to Claimant's contention, the ALJ did not simply summarize the medical evidence in the case. Instead, he looked at the treatment records, Claimant's statements, the medical source opinions, and Claimant's activities to make conclusions about Claimant's RFC. He then explained the results of his analysis and included restrictions in the RFC finding that accounted for Claimant's vertigo. Thus, Claimant's representation of the ALJ's evaluation of vertigo as "dismissive" simply is not accurate.

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR

96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ should assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ complied with the governing regulations and rulings, and his RFC finding was supported by substantial evidence. As the ALJ pointed out, Claimant had symptoms of dizziness, headaches, and vertigo for approximately two decades before he applied for disability benefits. The symptoms waxed and waned, which probably explains the sporadic treatment received by Claimant. In May 2011, while Claimant was still employed, he advised Dr. Rana that he had experienced chronic dizziness for several years and also had a spinning sensation at times. (Tr. at 383). He did not receive additional evaluation or treatment for those symptoms until June 2013. (Tr. at 330-32). Once again, Claimant described having dizziness for decades, stating that he had been told by Dr. Rana to undergo vestibular rehabilitation to alleviate the symptoms, but Claimant had not bothered to follow that instruction.

Another nine months passed before Claimant next addressed his dizziness with a health care provider. (Tr. at 391-93). In March 2014, Claimant reported that he was "doing the same," having headaches and dizziness. Dr. Rana offered to perform a video

EEG to get to the bottom of Claimant's dizziness and tinnitus, but Claimant refused, saying he could "live without it." (Tr. at 391).

After Claimant applied for disability benefits in April 2014, he began to complain more frequently of dizziness, the etiology of which was unknown. However, when Dr. Rana suggested that Claimant get further testing and a second opinion on the cause of his dizziness, he refused. (Tr. at 390). Claimant's treatment records in 2014 and 2015 demonstrate periodic, ongoing complaints of dizziness, but his examinations were routinely described as normal. None of the records documented any witnessed episodes of dizziness until February 5, 2016 when Claimant lost postural control during a computerized dynamic posturography that involved the removal of visual and proprioceptive cues. (Tr. at 540). At his follow-up visit to this testing, Claimant's vertigo was noted to be controlled and stable. (Tr. at 528). He was given a prescription for Maxzide. In early March 2016, Claimant continued to have dizziness, although it was documented to be less severe overall than in the past, and his Maxzide dosage was increased. According to a March 11, 2016 clinical record, Claimant made no mention of dizziness or vertigo.

Accordingly, the ALJ had good reasons for concluding that Claimant's medical history did not demonstrate disabling functional limitations related to vertigo. Not only had Claimant suffered from this symptom for decades, but he was able to perform many daily activities despite having the problem. Moreover, Claimant only sought treatment sporadically and refused more definitive diagnostic testing on at least two occasions. Taken as a whole, the undersigned **FINDS** that substantial evidence supports the ALJ's findings related to Claimant's vertigo.

### B. Credibility Analysis

Claimant also contends that the ALJ did not properly conduct a credibility analysis, because he made an RFC determination before evaluating Claimant's credibility. According to Claimant, the failure to analyze credibility as part of the RFC finding is prejudicial error. (ECF No. 13 at 12) (citing *Mascio v. Colvin,* 780 F.3d 632, 639-40 (4th Cir. 2015)). In *Mascio*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") examined "boilerplate" from an ALJ's written decision, which suggested that the ALJ had made an RFC determination prior to evaluating the claimant's allegations regarding the persistence, severity, and disabling effects of his impairments. The Fourth Circuit indicated that the ALJ had not followed agency rulings, which required the ALJ to compare the claimant's alleged functional limitations to the other evidence in the record, not to the RFC finding. *Mascio,* 780 F.3d 639. The Fourth Circuit found the error to be prejudicial in *Mascio*, because the ALJ failed to properly analyze the claimant's credibility anywhere else in the written decision. *Id.*

Unlike the ALJ in *Mascio,* however, the ALJ in the instant action performed a proper credibility analysis consistent with agency procedures. Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical

or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996

WL 374186, at *4-5. In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor

and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ set forth his RFC finding and then explained that "[i]n making this finding," he had considered all of Claimant's symptoms and the extent to which those symptoms could be reasonably accepted as consistent with the other evidence of record when applying the relevant regulations and rulings. (Tr. at 15). The ALJ proceeded to perform the two-step evaluation, concluding that Claimant's medical conditions could reasonably be expected to cause the type of symptoms complained of by Claimant. Nonetheless, the ALJ did not find Claimant's statements regarding the intensity, persistence, and limiting effects of the symptoms to be "entirely consistent" with the evidence. The ALJ followed with an articulation of his rationale for reaching that credibility determination.

Accordingly, the ALJ explicitly confirmed that he had compared Claimant's statements to "the medical evidence and other evidence in the record," not to the RFC finding as the *Mascio* ALJ was criticized for doing. (Tr. at 16). The ALJ provided logical reasons for concluding that Claimant's symptoms were not as disabling as he described them to be; in particular, Claimant was able to participate in more activities than an individual plagued by debilitating symptoms would be able to do; he had worked many years with essentially the same symptoms; he did not actively pursue medical treatment at the level and frequency one would expect if the symptoms truly interfered with most all of his daily activities; and the objective medical records failed to document abnormalities corroborative of Claimant's statements. As previously explained, the ALJ performed a thorough assessment of the evidence and sufficiently

explained his conclusions. Therefore, the undersigned **FINDS** no error in the ALJ's credibility analysis.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 16); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v.*

*Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: May 18, 2018

_____
Cheryl A. Eifert
United States Magistrate Judge